Martin, J.
delivered the opinion of the court. The defendants contend that the mortgage on which this action is brought is void. 1. Because, contrary to a provision of the Civil Code, 453, art. 6. 2. Because, its object was to give the plaintiff an undue preference over the rest of the insolvent's creditors.
I. The article of the civil code stated, declares, “that there is no conventional mortgage, except that which is expressly stipulated, in the act or writing made by the parties : it, is never understood, and is not inferred from the nature of the act.”
On this, the defendants’ counsel contends, that as the mortgage is to secure the plaintiff, among other things, against future endorsements, within a given time and no express sum is mentioned, the court must declare the mortgage null, at least as to those future endorsements. On this we are of opinion, that the objection cannot prevail. This is emphatically a mortgage expressly stipulated, and the amount of it, even in this part, is sufficiently express: id certum ut quod certum reddi potest.
II. The plaintiff’s counsel repels the objection made to the part of the mortgage, which relates to the price of a parcel of indigo, and *239 the indorsement of two notes, anterior to the date of the mortgage, on the ground that the transactions by which he became a creditor, in this respect, took place so short a time before the mortgage, that the court must presume that this kind of security was contemplated when the debt was created.
1. The date of the sale of the indigo cannot be ascertained from any part of the case before and the idea, that it was effected with a view to a mortgage, seems to be repelled by the testimony of Laignel. This gentleman swears, that in February or March, 1811, the plaintiff came to town and was compelled to stay five or six days to receive part of what was due him for some indigo sold to Dukeylus, a payment which was effected by the discount of a note, at a high interest, as the plaintiff informed the defendant. We are without any evidence of the date of the sale of the indigo, or of the time at which it was payable. For any thing that appears, the sale and time of payment were both anterior to the date of the mortgage. The plaintiff does not appear to have any better title to a security, under the mortgage, for the endorsement of the notes of the 26th of February and 3d of March, anterior to the mortgage. When a creditor requires a court to allow him *240 a privilege, he must prove his claim thereto : it does not suffice to shew circumstances which render it probable.
2. But it is further contended that, as to the two indorsements aforesaid, the plaintiff was a surety, and the debtor being in a state of bankruptcy, the plaintiff might, even before payment demand an indemnification. Civil Code, 430, art. 18.
When a debtor has become a bankrupt, debts due by him, although not yet payable, give to the creditors of them the right of acting with those whose debts are payable. But, weere the creditor, whose debt becomes as it were payable by the bankruptcy, to receive his payment, it would be an anticipated one—out of the course of business and subject to repetition for the benefit of the mass. If it were otherwise, there would be no use for the distinction in the books between a payment in due course of business, and one by anticipation : all the advantage intended to be given to the surety, in the part of the code cited, is to enable him to take as early measures for his indemnification as if the debt was already payable, and indeed as if he had paid it.
Whether a debtor, who is about to fail, may, by an anticipated payment, or a conveyance of *241 his property, defeat the intention of the law, which is that all his creditors may be equally satisfied out of his estate, is a question, which does not depend on the ordinance of Bilbao, although the parts of that ordinance, cited by the defendant’s counsel, furnish a good illustration of the principle by which we are to be guided. The discharge of a debt not yet payable, when the debtor has not wherewith to pay demands, which, according to his undertaking, claim the preference, is so glaring an evidence of partiality, that a court would set it aside, considering that partial justice is partial injustice, even if the ordinance did not require it. So would they an instrument made in deceit and fraud.
It is believed that the ordinance of Bilbao was never enforced by the Spanish government, in Louisiana. We never heard of the appointment of a prior, consuls, or any of the officers whom it requires, and without whom many of its provisions cannot be carried into effect. It is a deposit of principles, consecrated by other laws, relating to commercial affairs, which are there brought together and illustrated, and, in some instances, modified and extended. American jurists use it as a manual, and the court *242 has recognised the wisdom of some of its principles, but often rejected others as totally inapplicable to this country.
The 5th Partida, 15, 7, has been cited. It does not appear to us pregnant with all the evil consequences which the plaintiff’s counsel discovers. We do not believe that the object of its framers was to avoid every transaction which takes place within the year preceding the failure. It is rather a statute of limitations, fixing the year after the discovery of the fraud, in an alienation, as the period within which suit should be brought to set it aside. Neither is the effect of this law confined to the case of a debtor against whom there is a judgment: such a case being mentioned, according to Lopez, exempli gratiâ, ut evidentius dicatur constare de fraude.
It remains for us to inquire whether the two notes of the 15th of March and 20th of April, the aggregate amount of which is $4300, and which were endorsed after the mortgage, represent a fair debt, for which the plaintiff is entitled to privilege under the mortgage.
Our insolvent law 1808, 16, reprobates all alienations of property, on contemplation of its benefit, made within three months, unless the debtor, at the time of the alienation, receives a bona fide consideration therefore, and in the *243 case of Brown vs. Kenner & al. 3 Martin, 270, this court set aside a conveyance as to part, and supported it for the amount of a sum of money actually received by the debtor at the time of its execution. The present mortgage was made within three months of the failure, and in the contemplation of it, as well on the part of the mortgagee as in that of the mortgagor. Nothing was received by the mortgagor at the time of the execution of the deed. It would be absurd to conclude that the instrument is valid, if the cession of goods, which was intended, was made before, and bad if after, arrest. The object of the mortgagor, in the knowledge of the mortgagee, was the removal of a number of slaves, the whole of the mortgagor’s property which was susceptible of mortgage, out of the reach of the mass of his creditors, clearly to defeat the intention of the law. Unless, therefore, it appears that a bona fide consideration was received at the time, we must declare the mortgage null. The plaintiff’s counsel contends that it ought to suffice that a consideration was received afterwards. But we consider that the mortgage was void at the time that it was made, and according to the words of the act—void according to the principles of sound policy. From its date, it covered a large portion of the insol *244 vent's estate, from the claim of his creditors, without being represented by any thing, not even by the plaintiff’s obligation to endorse. If void at the time of its execution, no act of the person, for whose benefit it was intended, can make it good.
The district court acted correctly in setting the mortgage aside, and it is ordered, adjudged and decreed, that the judgment be affirmed with costs.
Livingston on a motion for a rehearing.
The objection made on the hearing to the testimony of Laignel, does not appear to have been taken into consideration by the court, because they rely on his testimony, to shew that Roussel knew Dukeylus was about to fail, and also as to the sale of the indigo.
Now Laignel is not a competent witness, and his interest appears on the face of the papers before the court, for he is a creditor of Dukeylus on his bilan, and there is no rule better established, than that interest whenever discovered shall disqualify. Take away this testimony, and a most material circumstance required by the law of 1808 to render the act invalid, is wanting, to wit : that it was done in contemplation of taking the benefit of the insolvent law. I pray the *245 serious attention of the court to this feature, because I firmly believe, the legislature intended to invalidate no other acts, than such as were done in the intention of making a cession, and giving in that case a preference, but that all acts, though they might ultimately give a preference, are not affected by the law.
Without the testimony of Laignel, there is not the slightest circumstance to shew either that Dukeylus intended to apply for relief under the insolvent law, or that Roussel knew it; and indeed with that testimony I think there is no such proof—every thing, on the contrary, indicates a desire of going on; he not only secured Dukeylus for what he already owed, but he secured further credits and advances. For what purpose? Surely not to enable him to take the benefit of the act, but to avoid it—I hope I may be excused in repeating that if the law of 1808 be taken as it is (and I think properly) by the court for the rule, then actual insolvency is not the test by which the validity of the act is to be tried, but the intent, the contemplation of making a cession.
To return to Laignel's testimony, his evidence, if not inadmissible, is most certainly incredible. As he states, it would appear that Roussel knowing Dukeylus' affairs to be desperate, not *246 only took security for past responsibilities, for which he might have motives, but without any obligation so to do, undertook to endorse notes to the amount of $11000, and more than a month afterwards actually endorsed notes, to the amount of more than $4000, a fact utterly inconsistent with that knowledge, which he must have derived from the information of Laignel, had it really been given—for what possible advantage was Roussel to derive from the transaction as to the subsequent notes, even supposing his mortgage given?
Laignel's testimony then, thus incompetent, or at least unsatifactory, and biassed by his interest, is the only circumstance to avoid the security as to the indigo, which, as it is not proved to have existed as a debt before, will not, I imagine, be presumed to be such an one, as it was not lawful to secure.
The court has totally overlooked the note for $1600 to Galez, dated 10th of March, two days only prior to the mortgage, which from that circumstance must certainly come within the provision of the law of 1808, a bona fide consideration then paid.
The court avoid the security as to the notes endorsed after the mortgage, by referring to the law of 1808, which they adopt as the true rule *247 of decision on this point. Now by this law two things are necessary to invalidate the security.
1. That it should be made in contemplation of the cession, which I think I have shewn was not the case here, but rather that it was made with intent to enable Dukeylus to avoid it; and I lay great stress on this argument, because I think the statute of 1808 has given the rule and the only rule : it has directed the courts as to what act shall be deemed void and what shall not. It has given a rule where, as I have shewn in my argument, there was none fixed by legislative will: (for the court agrees with me in thinking that the Curia Philipica has not the force of a law here) if the act of 1808 then, is our rule, we cannot go beyond, nor say that an act is void because the party was in “insolvent circumstances”, when the statute directs only that it shall be void, if made within three months of the bankruptcy, and “in contemplation of taking the benefit of a cession of goods.
2. The statute provides, that even if made within three months, and in contemplation of taking the benefit of the act, the security shall be considered and held as good and valid in the law, any thing contained in the statute notwithstanding, if the debtor at the time of execu *248 ting the same shall have received a bonâ fide consideration."
There is our rule : we have nothing to do but to understand and apply it. It is simple unequivocal—a bonâ fide consideration must have been received at the time of executing the security.
What is a bona fide consideration? Was it received in this case ? Here are the two questions on which this branch of the argument turns.
1. The bona fide consideration here required, is nothing more than a ‘good,' a 'valuable,' a ‘legal' consideration. The statute certainly does not mean to exclude a consideration from this definition, merely because it was given in contemplation of bankruptcy ; for it says that, even in that case, if it be bona fide, the deed shall be good. Now, if no consideration given in contemplation of bankruptcy were bona fide, then this provision would be an absurdity and defeat itself. The term, therefore, in the sense used here, means that the consideration shall be valuable, legal, and that it shall be given without deceit: "Bonæ fidei nihil magis congruit quam præstari id quod inter contrahentes actum est."
If the consideration then had been a forged *249 bond, or a note that Roussel knew to be bad, or if any other fraud had intervened to the prejudice of Dukeylus, it would not have been a bona fide consideration, and therefore would not have come under the proviso that it takes it out of the law—supposing this to be the proper definition of the words, let us now enquire whether such consideration was received at the time of executing the mortgager.
1. As to the price of the indigo ; there is no doubt that this was a valuable and legal consideration.
2. The prior responsibility incurred by endorsing the notes already in existence, was undoubtedly a legal and valuable consideration, and it had been received at the time of making the mortgage for, I pray the court to consider the particular phraseology of this law.
It does not make it necessary, that, at the time of making the security, the debtor receive a bona fide consideration (as is quoted by the court) but that at the period he shall have received it: evidently intending to include all considerations, existing at the time, whether prior or contemporaneous.
3. The endorsement of the subsequent notes, however, puts, I think the whole transaction out of any risk, under this proviso, not only for the *250 amount of those endorsements, but for the whole sum secured.
Admit for a moment that the two first considerations, the price of the indigo and the endorsement the prior notes did not form a good consideration, then received, and I then ask whether the engagement to endorse these notes and the actual endorsement of them to a large amount, do not form such a consideration? A person owes me $3000, for which I have no security, and he offers, if I will endorse $3000 more, to give me security for the whole. This surely is a good, a valuable and legal consideration, and as I have shewn, this is all that the proviso of the law of 1808 requires. For I repeat that it never can be said that it is not bona fide, merely because done, in contemplation of bankruptcy, when the proviso supposes that very base, and makes this an exception to it. I know that this reasoning is contrary to the decision in the case of Brown vs. Kenner & al. but in that case the court decided not to take the statute of 1808 as their guide, and they have acknowledged it in this.
If, however, the endorsement of the subsequent notes does not form a sufficient consideration for the security of the whole sum, it must, I most confidently hope, on consideration, *251 be decreed such for the amount of those notes : the court seem to consider the words of the law of 1808 strictly, and declare that the consideration having been paid, after the date of the mortgage, it cannot come within the proviso. Will the court excuse me if I remark that in the former part of the decision, this strictness is departed from, and the words “shall have received” are construed to mean receives, and that therefore I hope the same indulgence, if it should be required, will be afforded to this clause. For, surely, the court cannot determine that the legislature meant to make the security good, if the plaintiff had endorsed the notes at the time of executing the deed, but bad, because he endorsed them afterwards, in pursuance to a promise in the deed, that he should be secured if he should so endorse them. What difference, I respectfully ask, would it make to the conditions, except one greatly to their advantage, if Roussel, at the time of receiving the mortgage, had endorsed notes to the whole sum limited of 11,000 dollars. Was the stipulation in the mortgage that he should be secured for all the notes he might endorse, to the amount of $ 11,000, a legal one or not? No doubt can be entertained, after reading the authorities cited in the argument, that such a mortgage was legal *252 (independent of the law of 1808) and surely in that act makes it bad.
The court seem to consider, on this head, that Roussel was under no covenant to endorse : I think, a more close inspection of the mortgage will induce them to alter this opinion. The words are “Enfin pour sureté des autres endossements ou cautionements que le Sieur Mattias Roussel pourra donner ou fournir pour le Sieur Dukeylus, jusqu’a concurrence d’une somme de onze mille piastres.” Now if, after receiving this security, Roussel had refused to endorse for Dukeylus, it would, most unquestionably, have been deemed such a breach of faith, as vould have entitled Dukeylus to a suit. This is evident from the limitation of the sum to $11,000. Why was this introduced ? Clearly for the purpose of shewing the sum for which Dukeylus might call for Roussel's endorsements. The words pourra endosser, &c. were not introduced to give Roussel the option of endorsing or not, but to shew that Dukeylus was bound for no more than he should actually endorse within the limited time. The consideration, therefore, was the promise to endorse : it was a legal, a valuable consideration ; it was given at the time ef executing the security, and it was bona fide, for it has since been faithfully performed.
*253 Moreau for the defendants. The plaintiff's counsel complains that attention was paid to the testimony of Laignel, who it is contended was an incompetent witness.
It is true that, in the court below, this witness was objected to, on the ground of his appearing, by the insolvent’s bilan, one of his creditors. If the objection was to be insisted upon in this court, a bill of exceptions ought to have been, taken to the opinion of the inferior court. An important fact would then have been spread upon the record, viz. that the witness, though once an interested one, was now completely disinterested, having transferred all his rights for a valuable consideration and without a warranty. The plaintiff’s counsel yielded to the opinion of the inferior court, and the witness's deposition, taken in writing, is made a part of the statement of facts. It is therefore too late to object to his testimony in this court.
II. Without the testimony of this, witness, the plaintiff’s counsel contends there is no evidence, nothing from which this court may presume that Dukeylus intended to give an undue preference. Without this testimony, we contend this court would have presumed it. When a man, in failing circumstances, voluntarily transfers a part, *254 and a fortiori the whole, of his property to one, in exclusion of the rest of his creditors, the law concludes that his intention was fraudulent—the legal presumption, resulting from this single circumstance, suffices to establish the fraud. Bankrupts are always supposed to commit fraud. In this respect, presumptions and conjectures are looked upon as proofs. Cur. Phil. 408, n. 16.
Whether, in any particular case, a bill shall be considered as fraudulent, is a question on Which (as it must always depend upon the circumstances of each case, separate or combined, from which the intent of the party is to be inferred) it is difficult to lay down any precise general rule. But besides the circumstances, which afford evidence of fraud generally in conveyances : such as the deed being the voluntary act of the party, the transaction being secret, the grantor continuing in possession, &c. those from which fraud, in relation to the object of the bankrupt laws, has most commonly been inferred, are principally the extent of the conveyance, its being made in contemplation of bankruptcy. Cullen’s B. L. 43. 44.
These last expressions tally with those of our act of 1808, in contemplation of taking the benefit of this act, and relate, not only to the insolvent estate of the debtor at the time of the trans *255 action, but also to the causes which may have led to it.
Therefore, though a trader be insolvent at the time of the conveyance, if the transaction could not be considered as a mere voluntary act, as when done to avoid compulsory process, the transaction will not be holden fraudulent; but otherwise if he appears to have acted upon no other motive than his own will and the desire of granting an undue preference. But on the other hand, if the party be insolvent, or become so soon after the conveyance, although it may defeat that equality among the creditors, to secure which is so great an object of the bankrupt laws, or though (in the language commonly used on the occasion) it may operate as a preference to a particular creditor; yet, if the conveyance be not the voluntary act of the party (as when it is given to deliver him from legal process, from the threats or apprehension of it, or even from the pressure or importunity of a creditor, without the threat or actual apprehension of an arrest) it cannot be said to be done with the intent to defraud creditors : the preference, as it is called, being only consequential, will not be held fraudulent or an act of bankruptcy. Id. 51, 52.
This is the reason on which the law does not only consider as good, but even authorises the *256 payment by an insolvent of a debt actually due on the very day of the failure. Partida 5, 15, 8. There certainly results a preference from this payment, but the law does not consider it as undue, because the payment may have been made from other motives, than the mere will of the debtor, and without any fraud on his part.
The mortgage of the plaintiff was executed on the 12th of March, 1811. The witnesses all agree that from the beginning of the year Dukeylus's credit was ruined—his notes were discounted at an exorbitant interest—his goods were sent to auction and sold below the cost: he was at a loss to take up even small notes, and threatened his endorsers to suffer them to be protested, and in the month of February, the general opinion of his friends was that he could not stand it any longer, and his failure was unavoidable.
The mortgage was the voluntary act of the insolvent : his notes, endorsed by the plaintiff, were not yet payable; he could not be acted upon by the pressure of his debts, nor the threat or dread of any compulsory measures on the part of any of his creditors.
The preference given was undue on account of the extent of the property conveyed. Twenty-three slaves were mentioned, their value about $ 15000, the whole of the insolvent’s pro *257 perty, susceptible of being mortgaged and the other property ceded, is of a value relatively insignificant.
III. It is true the act of 1808, regards as valid the assignment of property, made by an insolvent, when made bona fide: but it is expressly required that the consideration be actually paid, at the time of the execution of the assignment—that the consideration be bona fide.
Now can it be said that the consideration, given by the plaintiff, was actually received by Dukeylus, at the time of the contract? Could the creditors of the latter, by any possibility, be benefited, even accidentally, by that part of the mortgage which relates to endorsements previously given by the plaintiff, without any stipulation that he should be in any manner secured?
It is true that in all cases, which turn upon the fraudulent intent of the debtor, the following circumstances (tho' with respect to some of them it is impossible to draw any precise line) must always be considered as favourable, and according as the particular case turns upon one or several of them, taken together, will have more or less weight, in the general consideration—as, *258 namely, when the party continues in good credit, and a bankruptcy does not take place till some time after the conveyance—where the transaction is beneficial to the generality of the creditors—where possession is given immediately. Cullen’s B. L. 53, 54.
Dukeylus failed on the 29th of April 1811, about seven weeks after the date of the mortgage, and it is clear that his creditors, far from receiving any advantage, were materially injured, by the mortgage, as far as it relates to prior endorsements. Let us examine, whether the case is more favourable, in regard to the part of the mortgage, intended to secure the plaintiff in regard to future endorsements.
Can a vague and loose promise to endorse in future to the amount of $11,000—a promise not express, but which is contended clearly to result from the plaintiffs acceptance of the mortgage, in the words of the law, be a bona fide consideration, actually received at the time of the contract? What benefit could the creditors possibly, or did they actually, derive from this pretended promise?
Let it be admitted that the plaintiff did furnish endorsements for $4300—the last note, thus endorsed for $3800, was given three days before the failure. Is it clear that the amount of it, *259 increased the estate out of which the creditors are to be paid, or is not the presumption strong that this endorsement was for the renewal of a note, endorsed by the plaintiff? If this be not the case, where is the property represented by this note?
If property be purchased from a man in failing circumstances, not within the knowledge of the buyer, the latter, on proof of an actual payment, ought to be protected, especially if the proceeds of the sale are found in the mass of the debtor’s estate, and the creditors are thereby benefited. On this ground, was the decision of the court in the case of Kenner & al. vs. Brown, 3 Martin 270. But in the present case the plaintiff has nothing similar to allege. As to the endorsement, prior to the mortgage, no consideration was received : the creditors derived no benefit. As to the subsequent endorsements, they could only tend to increase the mass of the debts, by affording to the insolvent the facility of raising money, by discounting notes to great disadvantage. The plaintiff does not appear to have been under any obligation, express or implied, to endorse. There are no words in the conveyance from which this obligation may be inferred. It speaks only of notes which he, the plaintiff, may endorse, qu’il pourra endosser.
*260 Finally, he complains that the court pass over, in silence, the note of $1600. It was quite useless to mention it, since the judgment declares the whole mortgage to be null and void. But we are to observe, that this note could neither be considered, as endorsed at the date of the mortgage, which that instrument was intended to cover, because those notes are therein detailed, nor as one endorsed after the mortgage, because it has an anterior date. It has been alleged that, tho’ dated before the mortgage, it was endorsed after it. But this allegation is not supported by any part of the testimony, and is, on the contrary, discredited by that of Galez, Who deposes that he procured the discount of it before the date of the mortgage, and he expressed his surprise to the plaintiff, when he discovered that it was not mentioned in the mortgage.
REHEARING REFUSED.